Case 1:07-cv-06757   Document 1   Filed 11/30/2007   Page 1 of 16

CEM

FILED
NOVEMBER 30, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CARLTON TECHNOLOGIES, INC., | ) | **07 C 6757** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07 _____ |
| | ) | |
| JEFFREY GRAFSTEIN | ) | |
| and BIZ 120, INC., | ) | Trial by Jury Demanded |
| | ) | |
| Defendants. | ) | **JUDGE COAR** |
| | | **MAGISTRATE JUDGE MASON** |

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, Carlton Technologies, Inc. ("Carlton"), by its attorneys, and for its Complaint for Injunctive and Other Relief against Jeffrey Grafstein ("Grafstein") and Biz 120, Inc. ("Biz 120"), states as follows:

**Nature of the Case**

1.  This is an action to obtain relief for, *inter alia*, violation of the federal Computer Fraud and Abuse Act by Carlton's former employee, Grafstein; Grafstein's blatant violations of the confidentiality and non-solicitation provisions in his Employment Agreement with Carlton; misappropriation of Carlton's trade secrets in violation of the Illinois Trade Secrets Act; and breach of fiduciary duty by Grafstein. While still employed as a trusted, highly-compensated employee of Carlton, where he had access to Carlton's confidential and proprietary information, Grafstein formed a company, Biz 120, to directly compete with and intentionally divert business opportunities away from Carlton using Carlton's own trade secrets and confidential information. Although Carlton's investigation into Grafstein's activities is ongoing, it is evident thus far that Grafstein: (a) accessed Carlton's computer systems for the purpose of stealing numerous files and records containing Carlton's confidential information and trade secrets about its customers,

business practices, pricing strategies, and techniques, which he is now using to compete unfairly with Carlton on a daily basis; (b) intentionally diverted business opportunities from Carlton while still under its employment; and (c) solicited and engaged in business transactions with Carlton customers during the restricted non-solicitation period under the Employment Agreement.  Unless enjoined by the Court, Grafstein and Biz 120 will continue to violate Carlton's contractual, statutory, and common law rights, cause irreparable injury to Carlton's business, and continue to compete unfairly with Carlton.

## The Parties

2. Carlton is an Illinois corporation with its principal place of business located at 939 North Avenue, Suite 640, Chicago, Illinois.

3. Grafstein is an individual residing at 729 Sumac Road, Highland Park, Illinois.

4. Biz 120 is an Illinois corporation with its principal place of business in Highland Park, Illinois.  On information and belief, Grafstein is the sole owner and employee of Biz 120.

## Jurisdiction

5. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.  Count I alleges a violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*  This Court has supplemental jurisdiction over the remaining claims because they "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

## Venue

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because, *inter alia,* Grafstein resides in this judicial district, Biz 120 maintains an office in this judicial district, and Grafstein's and Biz 120's unlawful conduct occurred in this judicial district.

**The Business of Carlton**

7. Formed in 1998, Carlton is a leader in providing and servicing refurbished wireless data collection devices, bar code scanners, and related hardware for commercial clients throughout the United States, Canada, and Europe.

8. Carlton has devoted significant time and expense to developing its confidential customer list. Carlton has three sales professionals who are devoted full-time to developing new business opportunities and servicing existing customers.

9. Carlton's relationships with its customers are recurring and long-term in nature. Carlton has been doing business with the majority of its customers for several years.

10. At great time and expense, Carlton has compiled a database of critical confidential information about its customers and prospective customers that provides it with a competitive advantage. Information within this database includes key contacts and decision makers; historical purchase information for each customer; a communication log identifying each communication with the customer reflecting their past, present, and future purchasing, selling, and maintenance needs; pricing strategies; profitability; gross and net profit margins; specific customer installation platforms detailing all equipment and accessories they used in the past and present; and each customer's plans for future purchases and maintenance. This information is not available publicly.

11. Carlton also buys refurbished and new products from outside vendors. Carlton maintains confidential information about the various vendors, including what products they currently or typically have in inventory, when they may be making these products available, the pricing strategies, profitability, and gross and net profit margins for past transactions. This information is confidential.

12. In its computer systems, Carlton maintains numerous files titled "electronic price ordering guides" or "epog's." This information contains various confidential information about specific products, including part numbers, part descriptions, list prices, and distribution prices. Carlton has compiled these epog files over the course of many years. These files are invaluable to Carlton as this information is no longer publicly available.

13. Carlton has implemented several strict security measures to insure that its confidential information and trade secrets are not used or disclosed outside of Carlton or outside of the key employees with whom such information is shared. For example, all Carlton computer systems are password protected with access limited to employees on a need-to-know basis. In addition, all employees of Carlton are required to sign confidentiality agreements in which they acknowledge the confidential nature of Carlton's information, agree not to use or disclose such information to the detriment of Carlton, and agree to return all such information to Carlton at the conclusion of their employment. The cabinets, desks, and office areas where documents reflecting Carlton's confidential information are retained are not open to persons who are not employed by Carlton.

**Grafstein's Employment with Carlton**

14. Carlton hired Grafstein as Senior Account Executive and Director of Wireless Data Collection and Scanning Devices commencing on February 21, 2002. In connection with his hiring, Grafstein entered into an Employment Agreement with Carlton (the "Employment Agreement"). A true and correct copy of the Employment Agreement is attached hereto as Exhibit A.

15. The Employment Agreement provides, in relevant part:

    **8.**     **Confidentiality.**

Employee recognizes that Employer has and will have information regarding the following:

- products
- margins
- discounts
- business affairs
- marketing plans
- prices
- costs
- future plans
- costs
- customer lists

and other vital information (collectively "Confidential Information") which is valuable, special and unique assets of Employer. Employee agrees that the Employee will not at any time or in any manner, either directly or indirectly, divulge, disclose, or communicate in any manner any Confidential Information to any third party even if such Confidential Information was developed by the Employee during the term of employment of Employee or obtained during or after the term of employment of Employee, without the prior written consent of the Employer. Employee will protect the information and treat it as strictly confidential. A violation by Employee of this paragraph shall be a material violation of this Agreement and, in the event of a violation, Employer shall be entitled to both legal and equitable relief. Employee acknowledges and agrees that the sale or unauthorized use or disclosure by Employee of any Confidential Information of the Employer constitutes unfair competition, and during the term of his employment with the Employer and thereafter, Employee will not engage in any unfair competition with the Employer by directly or indirectly using the Confidential Information, nor will Employee directly or indirectly disclose, publish, or make use of, nor authorize anyone else to use Confidential Information or any information or knowledge which in any way relates to the business, product or services of the Employer.

*       *       *

**10.    Non-Solicitation.**

In order to protect Employer's longstanding business relationships, Employee agrees that he/she will not, for a period of one hundred eighty days (180) after his/her employment with Employer ceases

for any reason, solicit, directly or indirectly, whether for Employee or as an officer, director, employee, agent or independent contractor of another, for purposes of performing any services or furnishing any equipment of a type similar to that provided by Employer to any client of Employer for whom Employee had contact with during the term of Employee's employment or any person or entity that Employee learned about or obtained any information concerning said person or entity's need for equipment or services as a result of Employee's employment. "Client," as used herein, shall mean any person or entity for whom Employer performed services or sold equipment within a twelve (12) month period prior to the termination of employee's employment.

**11.   Injunction.**

Employee agrees that should he/she breach any provision of this Agreement, Employer will suffer irreparable injury and will have no adequate remedy at law. In such an event, Employer shall be entitled to obtain temporary, preliminary and permanent injunctive relief, without bond in any proper court which shall include the Circuit Courts of Cook County, Illinois. In addition to the above, should Employee breach this Agreement, Employer's rights shall be cumulative and Employer may also seek recovery of money damages as well. Thus, all covenants of this Agreement shall survive the termination of Employee's employment.

**12.   Records Belong to Employer.**

All books, records, files, forms, reports, accounts, papers and documents relating in any manner to the Employer's business, vendors, suppliers, or customers, whether prepared by Employee or anyone else, are the exclusive property of the Employer and shall be returned immediately to the Employer upon termination of employment or upon the Employer's request at any time. This excludes items that belonged to the Employee prior to the beginning his/her employment with Employer.

**13.   Return of Property.**

Upon termination of employment, the Employee shall deliver all property (including keys, records, notes, data, memoranda, models, and equipment) that is in the Employee's possession or under the Employee's control with is Employer's property.

16.   As a Senior Account Executive, Grafstein's responsibilities included establishing and maintaining relationships with a large number of Carlton's customers. Grafstein had regular

contact with those customers, and he had access to confidential information concerning pricing, revenues, budgets, forecasts, and customer contact information about all of Carlton's customers.

17.     Grafstein created proposals for customers and pitched the proposals to the customers.  Grafstein also met with clients on a regular basis and participated in phone conversations to establish and maintain good customer relationships.  Grafstein attended sales meetings at Carlton where the sales team would discuss new customers, new pitches, and any other important issues.  In his position, Grafstein had access to all of Carlton's computer systems and confidential files.

18.     Grafstein did not bring an established set of revenue generating customers with him when he joined Carlton.  A majority of the accounts assigned to Grafstein were introduced to him by Carlton.

19.     During the course of his employment with Carlton, Grafstein had access to Carlton's most confidential information and trade secrets, as described above.

20.     Grafstein resigned from his employment with Carlton on February 8, 2007.

**Grafstein's Formation of Biz 120 to Unfairly Compete With Carlton**

21.     Unbeknownst to Carlton, Grafstein surreptitiously began planning his exit from Carlton well before February 2007.  According to public records, Grafstein incorporated Biz 120 in the State of Illinois in December 2006.  In December 2006, Grafstein also purchased a domain name and created his website, biz120inc.com.

22.     Biz 120's business model is indistinguishable from Carlton's business model.  Biz 120 actively buys, sells, and repairs a broad range of technology in direct competition with Carlton.  Biz 120 buys various products, including hand held scanners, imagers, and wireless data collection terminals and sells reconditioned scanners and other accessories.  Biz 120 also

7

repairs scanners and other wireless devices. Biz 120's website, www.biz120inc.com, promotes itself as providing the identical services Carlton provides (e.g., "Biz 120 provides hardware and repair solutions for scanning and mobile RF devices").

23.     In or around late December 2006, while still employed by Carlton, Grafstein created Biz 120 to directly compete against Carlton. Also during that time, Grafstein intentionally diverted business leads and opportunities from Carlton to Biz 120. While Carlton's investigation is still ongoing, Carlton's preliminary investigation has revealed at least two business opportunities Grafstein did not reveal to Carlton. Both transactions requested quotes for specific products and services that Grafstein deliberately neglected to enter into Carlton's system.

**Breaches of Employment Agreement and Other Unlawful Conduct by Grafstein**

24.     Carlton recently discovered that, on a single day in October 2006, Grafstein accessed hundreds of files in Carlton's computer systems containing Carlton's confidential information. These files include:

- Business Plan Outline—contains confidential information regarding Carlton's business model and specific business plan.

- E-D Order and Receipt Procedure—contains confidential information about Carlton's fifth largest customer including its order history as well as preferred procedures for orders, including quantities and pricing information.

- E-D Repair Procedures—contains confidential information regarding Carlton's fifth largest customer and details the processes and procedures for servicing and repairing its specific products.

- Epog—contains product pricing, product part numbers, product descriptions, and quantity information that is no longer available to the public.

- gm-by-prod—contains Carlton's confidential gross profit margin information by product.

- Goals—contains Carlton's confidential business goals.

- Maintenance 2005—contains confidential information regarding Carlton's service and repairs for its second largest service customer, including what products it repaired, cost

information, and legal requirements. Grafstein had no legitimate business reason to access this information, the contract was not up for renewal at that time.

- Purchase Contract-AccuCode—contains confidential information regarding customer purchases, including legal requirements on each contract, pricing, and quantity information.

- Repair Procedures—contains confidential information that Carlton has compiled regarding the repair of its products as well as legal requirements for each.

25. Carlton's investigation has revealed that, in connection with his enigmatic plan, Grafstein improperly attached a portable media device to Carlton's company issued laptop and downloaded confidential Carlton documents to this external media source for no legitimate business reason with the intent to directly compete and divert business opportunities from Carlton. For example, Grafstein downloaded a "Price Guide." This document, labeled confidential, contains confidential product and pricing information, including list price, distributor price, and Carlton's sales price for multiple products, which would enable Grafstein and Biz 120 to under bid Carlton on all future business opportunities and transactions. Grafstein also downloaded four documents titled "Epog 95," "Epog 97," "Epog 98," and "Epog 99," which further allow Grafstein and Biz 120 to directly and unfairly compete against Carlton on a daily basis.

26. Grafstein is able to use this confidential information for the benefit of himself and Biz 120. The use of all of the sensitive and confidential information Grafstein misappropriated during his employment and prior to his resignation from Carlton allows Grafstein to underbid and divert business opportunities from Carlton and unfairly compete with Carlton utilizing its confidential information.

27. The files that Grafstein accessed are invaluable to an individual starting a competing company, such as Biz 120. They provide Grafstein and Biz 120 with an unfair

competitive advantage with respect to product pricing strategies, customer specific pricing strategies, and customer specific requirements, to name a few.

28.     Although the non-solicitation period in the Employment Agreement did not expire until August, Grafstein blatantly ignored this restriction, solicited Carlton's customers, and diverted business opportunities from Carlton on behalf of Biz 120. One example of Grafstein's violation of the non-solicitation agreement occurred on May 25, 2007. Grafstein sent an email to the main purchasing contact of a long-time customer of Carlton using the identical font, format, and content of a document he took from Carlton. The email promoted Biz 120 as an active buyer, seller, and repairer of a broad range of technology including hand held scanners and wireless data collection terminals. Grafstein had contact with this individual during the term of his employment, and Carlton performed services or sold equipment to this customer within a twelve (12) month period prior to the termination of his employment. Grafstein knowingly violated the terms of his Employment Agreement. On information and belief, Grafstein sent multiple identical or similar communications to other Carlton customers and contacts during the restricted period.

29.     During the restricted period, Grafstein also went further than just contacting a Carlton customer. Grafstein and Biz 120 sold and shipped products to Carlton's second largest customer. Grafstein and Biz 120 utilized the confidential pricing and product information that Grafstein stole from Carlton to gain a competitive advantage and directly divert business opportunities from Carlton. Grafstein knew he was to have no contact with this customer and intentionally violated his Agreement with Carlton.

30.     Grafstein and Biz 120 are directly competing with Carlton in the exact areas in which Carlton has developed its competitive edge. Grafstein and Biz 120 have an unfair

competitive advantage against Carlton because Grafstein can use his knowledge of confidential information about Carlton's pricing and revenue information, customer information, and marketing plans, to steal current and prospective customers and contacts from Carlton.

31. On information and belief, Grafstein and Biz 120 retained and are currently using records containing Carlton's confidential information and trade secrets.

32. Grafstein not only accessed a number of Carlton files containing confidential information from his work computer and his home computer, but he intentionally attached a portable media storage system to steal files from Carlton's computer system for personal gain. No legitimate business justification existed for Grafstein to access such files at that time. Grafstein accessed files relating to confidential business plans, confidential customer pricing information, confidential sales forecasts, and revenue forecasts.

## COUNT I

**(Violation of the Computer Fraud and Abuse Act by Grafstein)**

33. Carlton realleges and restates paragraphs 1 - 32 as if fully restated herein.

34. The Computer Fraud and Abuse Act provides for a private right of action against anyone who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer if the conduct involved an interstate or foreign communication." 18 U.S.C. §§ 1030(a)(2)(C).

35. Carlton has maintained and at all relevant times maintained a computer network that is used to communicate with and service customers throughout the United States, Canada, and Europe. Carlton's computer system is connected to multiple offices, including in Illinois, Michigan, and Canada, and Carlton maintains an interstate computer network. Carlton's computer network is used in interstate and foreign commerce.

36. In the months leading up to Grafstein's resignation, Grafstein accessed Carlton's computer system on multiple occasions to obtain Carlton's confidential and trade secret information for purposes of unfairly competing against Carlton.

37. Grafstein transferred documents, files, and information copied or taken from Carlton's computer network.

38. By dishonest means, Grafstein knowingly and with the intent to defraud accessed Carlton's computer network for its confidential information and, by means of unauthorized access, Grafstein furthered the intended fraud and obtained confidential information of value.

39. Each instance of Grafstein's accessing and obtaining information without authorization constitutes a separate violation of the Computer Fraud and Abuse Act. Carlton has been damaged as a result thereof by the amount of at least $5,000 in the past year, including in the form of, *inter alia,* payments for measures aimed at discovering the extent and consequences of Grafstein's unauthorized activities and damage to the integrity of the data.

## COUNT II

### (Violation of Illinois Trade Secrets Act by Grafstein and Biz 120)

40. Carlton realleges and restates paragraphs 1 - 39 as if fully restated herein.

41. As set forth above, Grafstein was given access to and is in the possession of certain confidential and proprietary information of Carlton constituting "Trade Secrets" as defined in the Illinois Trade Secrets Act ("ITSA"), 765 Ill. Comp. Stat. 1065/1 *et seq.*

42. Carlton's customer lists, historical purchase information, pricing strategies, profitability, gross and net profit margins, and equipment needs and plans are sufficiently secret

to derive economic value from not being generally known to other persons or entities who can obtain economic value from its use or disclosure.

43. Carlton's customer lists, historical purchase information, pricing strategies, profitability, gross and net profit margins, and equipment needs and plans are the subject of efforts that are reasonable under the circumstances to maintain their secrecy or confidentiality.

44. Grafstein and Biz 120 have used, disclosed or threatened to use or disclose Carlton's trade secret information with full knowledge that this information was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

45. Grafstein and Biz 120's unauthorized use or disclosure, actual or threatened, violates the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.*

46. Grafstein and Biz 120's misappropriation, use, and disclosure of Carlton's trade secrets will cause irreparable harm for which there is no adequate remedy at law. As a result of the foregoing, Carlton has suffered and will continue to suffer irreparable harm.

## Count III

### (Breach of Contract by Grafstein)

47. Carlton realleges and restates paragraphs 1 - 47 as if fully restated herein.

48. The Employment Agreement is a valid and enforceable contract.

49. Carlton fully performed all of its obligations under the Employment Agreement.

50. Grafstein has breached the Employment Agreement by, *inter alia*, (a) soliciting customers whom he was prohibited from soliciting during the restricted period; and (b) misappropriating and utilizing Carlton's confidential information.

51. Unless an injunction is issued prohibiting Grafstein from utilizing Carlton's confidential information, Carlton will suffer irreparable and incalculable harm, including the

continued loss of proprietary and confidential information for which it may never be compensated.

## COUNT IV

### (Breach of Fiduciary Duty by Grafstein)

52. Carlton realleges and restates paragraphs 1 - 52 as if fully restated herein.

53. Grafstein, as an employee of Carlton, owed fiduciary duties with respect to the conduct of Carlton's business. These fiduciary duties included the obligation to deal honestly, loyally, fairly and openly with Carlton and to not usurp business opportunities.

54. Grafstein breached his fiduciary duties to Carlton by, *inter alia,* (a) failing to devote his entire time, energy, attention and loyalty to the business of Carlton; (b) competing with Carlton through his improper use of Carlton's proprietary and confidential information; (c) soliciting actual and prospective Carlton customers and diverting Carlton's business to Biz 120 while still employed by Carlton.

55. By reason of the foregoing, Grafstein and Biz 120 have directly and proximately caused injury to Carlton, and Carlton has suffered, and continues to suffer, substantial injury as a result of Grafstein's breaches of his fiduciary duties.

## PRAYER FOR RELIEF

Wherefore, Carlton requests that judgment be granted in its favor and against Grafstein and Biz 120 and that it be granted:

(a) A preliminary and permanent injunction order barring Grafstein, Biz 120, his agents, and any third party acting in concert with him from using, copying, analyzing or disseminating Carlton's confidential, proprietary information in any fashion;

(b) An order granting Carlton's representatives immediate access to Grafstein's residence to take possession of: (1) any and all documents, files, or any other materials which are the property of Carlton; (2) any and all computers belonging to or under the control of Grafstein; and (3) any and all computer storage media, including floppy disks, CD-ROMS, CD-Rs, CD-Read/Write discs, optical discs, flash memory, USB drives, disks, or memory, Zip disks, Jazz disks, Superdisks, removable or portable hard disks, removable or portable electronic storage and/or any other computer storage media under Grafstein's control which may contain files and/or any other electronic information constituting the property of Carlton, and/or which may contain, comprise, include and/or incorporate trade secrets and/or confidential information belonging to Carlton;

(c) A permanent injunction against Grafstein, Biz 120, their agents, and any person acting in concert with them, prohibiting them from using or disclosing Carlton's confidential proprietary and/or trade secret information;

(d) An order directing Grafstein, Biz 120, their agents, and any person acting in concert with them, to account for and return to Carlton any and all documents containing or reflecting information concerning Carlton's customers, products, or business, in whatever form, including electronic files, that Grafstein and/or Biz 120 retained following the resignation of Grafstein's employment with Carlton;

(e) disgorgement of profits unlawfully obtained by Grafstein and Biz 120;

(f) return of the compensation paid to Grafstein during the period of disloyalty;

(g) compensatory and punitive damages;

(h) attorney's fees and costs; and

 (i) such other and further relief as may be appropriate.

        Respectfully submitted,

        CARLTON TECHNOLOGIES, INC.

        By:_____/s/ John M. Dickman_____

        John M. Dickman
        Ronald Y. Rothstein
        Sheila P. Frederick
        WINSTON & STRAWN LLP
        35 West Wacker Drive
        Chicago, Illinois
        (312) 558-5600
        (312) 558-5700 (fax)

        Attorneys for Plaintiff