# Exhibit G

## Rosenberg, Sonya

| | |
|---|---|
| **From:** | Moeller, Chad W. |
| **Sent:** | Tuesday, June 17, 2008 2:21 PM |
| **To:** | Rothstein, Ron |
| **Cc:** | Kelber, Michael G.; Rosenberg, Sonya; Dickman, John M.; Frederick, Sheila P. |
| **Subject:** | Request for additional information in advance of settlement discussions |

**Attachments:** img117.pdf

Ron:

We have had an opportunity to consider your request for additional information in advance of any settlement discussions. To recap, you indicated to me last week that Carlton is prepared to discuss settlement provided that Mr. Grafstein produce: (a) documents verifying payments that he and Biz 120 received from Carlton's "customers" during the restricted period; and (b) any "side agreements" between Mr. Grafstein/Biz 120 and Sterling Mobile and/or Access POS.

First, we have produced copies of all relevant invoices issued during the restricted period, and you have received others in response to your subpoenas. It is safe for you to assume that Biz 120 has received payment from any customer to which it issued an invoice (with the exception of Carlton, of course). We are not entirely clear why your client needs duplicative information, but if it is because your client suspects that Mr. Grafstein and/or Biz 120 received some sort of "under the table" payments, your client is misguided. You have all the information you need. Accordingly, because we have already provided this information, we are not inclined to produce any additional information that may be responsive to your first request.

Second, there are no "side agreements" between Mr. Grafstein/Biz 120 and Sterling Mobile and/or Access POS. Mr. Grafstein is not particularly concerned that Brad O'Malley is "willing to talk," because nothing Mr. O'Malley will say should be damaging to Mr. Grafstein or Biz 120's respective defenses. Biz 120 and Access POS are, however, parties to a simple Mutual Confidentiality and NonDisclosure Agreement, although it is not relevant to this matter. As a gesture of good faith, I have attached a copy of the Agreement.

As we have communicated to you and your colleagues since the inception of this lawsuit, Mr. Grafstein is interested in amicably resolving this matter. But it is in everyone's interest to ensure that the parties' settlement expectations are reasonable and realistic. Given your comment last week that your client expects to recover its attorneys' fees in addition to some other (perhaps nominal) payment, we sense that your client views this case as a much larger matter than it really is. Despite repeated requests, including formal requests in our written discovery, we have yet to receive any damages calculation from your client. Your knee-jerk response to "ask [my] client for the information" is, frankly, getting old and counter-productive. Even under the worst-case scenario from our standpoint, we do not see your client recovering a great deal of money. In fact, we don't see any basis for your client's claim for attorneys' fees. Because you and your client obviously feel differently, it would be helpful to us, and to the settlement process in general, to get a better understanding of the basis of your client's demand.

Mr. Grafstein continues to be interested in discussing settlement, but given the obvious animosity between the parties, any settlement discussions will need to occur at a settlement conference with the court. Mr. Grafstein is distrustful of Mr. Bracken, and vice versa. My client continues to question why he has any incentive to begin discussing settlement without having received a single document from your client. My only response to him is perhaps this case will be resolved sooner rather than later. Please let me know when you and your client are available for a settlement conference. If the parties are unable to make some meaningful progress on settlement shortly, Mr. Grafstein has authorized us to file a motion to compel, requiring your client to actually comply with its discovery obligations.

I look forward to hearing from you.

Chad W. Moeller
Neal, Gerber & Eisenberg LLP

2 North LaSalle Street, Suite 2200
Chicago, Illinois 60602
(312) 269-5370 (direct)
(312) 750-6452 (direct fax)
cmoeller@ngelaw.com

# Exhibit H

**Rosenberg, Sonya**

| | |
|---|---|
| **From:** | Moeller, Chad W. |
| **Sent:** | Monday, June 30, 2008 7:44 AM |
| **To:** | 'Rothstein, Ron' |
| **Cc:** | 'Dickman, John M.'; 'Frederick, Sheila P.' |
| **Subject:** | Document Production |

When are you going to produce your documents?

Chad W. Moeller
Neal, Gerber & Eisenberg LLP
2 North LaSalle Street, Suite 2200
Chicago, Illinois 60602
(312) 269-5370 (direct)
(312) 750-6452 (direct fax)
cmoeller@ngelaw.com

# Exhibit I

## Rosenberg, Sonya

**From:**     Moeller, Chad W.
**Sent:**      Tuesday, July 01, 2008 4:17 PM
**To:**         'Rothstein, Ron'
**Subject:** Your Documents

Ron:

Hopefully by now you've had an opportunity to make whatever calls you needed to make (either to your client or to your colleagues) to ascertain when your document production will be ready.  As you know, your documents were originally due May 12.  They are nearly two months overdue.  When can we expect your documents?  If we do not receive the documents shortly, we will file a motion to compel and for fees.  We do not agree with your contention that your client's documents are "irrelevant" for purposes of the impending settlement conference.

Chad

Chad W. Moeller
Neal, Gerber & Eisenberg LLP
2 North LaSalle Street, Suite 2200
Chicago, Illinois 60602
(312) 269-5370 (direct)
(312) 750-6452 (direct fax)
cmoeller@ngelaw.com

# Exhibit J

# WINSTON & STRAWN LLP

| | | |
|---|---|---|
| 43 RUE DU RHONE<br>1204 GENEVA, SWITZERLAND<br><br>BUCKLERSBURY HOUSE<br>3 QUEEN VICTORIA STREET<br>LONDON, EC4N 8NH<br><br>333 SOUTH GRAND AVENUE<br>LOS ANGELES, CALIFORNIA 90071-1543 | 35 WEST WACKER DRIVE<br>CHICAGO, ILLINOIS 60601-9703<br><br>(312) 558-5600<br><br>FACSIMILE (312) 558-5700<br><br>www.winston.com | 200 PARK AVENUE<br>NEW YORK, NEW YORK 10166-4193<br><br>21 AVENUE VICTOR HUGO<br>75116 PARIS, FRANCE<br><br>101 CALIFORNIA STREET<br>SAN FRANCISCO, CALIFORNIA 94111-5894<br><br>1700 K STREET, N.W.<br>WASHINGTON, D.C. 20006-3817 |

RONALD Y. ROTHSTEIN
(312) 558-7464
rrothstein@winston.com

July 2, 2008

**VIA E-MAIL & FEDERAL EXPRESS**

Chad W. Moeller, Esq.
Neal, Gerber & Eisenberg LLP
2 North LaSalle Street
Suite 2200
Chicago, Illinois 60602

        **Re:**    **Carlton Technologies, Inc. v. Jeffrey Grafstein and BIZ 120, Inc.**

Dear Mr. Moeller:

       Enclosed please find a compact disc containing a production of documents bearing Bates numbers CARLTON000001 – CARLTON000676. These documents are being produced to you under the terms of the stipulated protective order governing discovery in this case.

       Please contact me if you have any questions.

       Very truly yours,

       Ronald Y. Rothstein

# Exhibit K

## Rosenberg, Sonya

**From:**     Moeller, Chad W.
**Sent:**     Thursday, July 03, 2008 3:30 PM
**To:**        Rothstein, Ron
**Cc:**        Dickman, John M.; Frederick, Sheila P.
**Subject:** Carlton's document production

Ron:

Even a quick review of your client's document "production" establishes that it is deficient. As an initial matter, you have failed to designate which documents are responsive to which requests, which makes it impossible for us to determine which requests you have have actually responded to. As an example of your client's stubborn refusal to comply with the Federal Rules of Civil Procedure, and as we have discussed on several occasions (including during our Rule 37 conference on May 30), your client has yet to produce a list of its "Clients" that Mr. Grafstein was barred from soliciting under the terms of his Employment Agreement. The term "Client" is defined under the Employment Agreement as "any person or entity from whom Employer performed services or sold equipment within a twelve (12) month period prior to the termination of employee's employment." (Paragraph 10). We are entitled to this information and the other information we have sought, in advance of the settlement conference.

I am not inclined to keep repeating our same discovery-related points that you and I have exhaustively discussed. I direct you to my Rule 37 letter and the email, below, summarizing our Rule 37 conference. As you know, I am out of the office next week. Please work with Sonya Rosenberg about supplementing your discovery responses as you committed during the Rule 37 conference (see below). We will expect your supplemental responses no later than Friday, July 11. Meanwhile, I have instructed Sonya to start preparing a Motion to Compel and for Fees. We will file the Motion upon my return to the office on July 14.

Finally, we should be in a position next week to produce the Elijah CD. At this point, I do not anticipate that we will be withholding anything on relevancy grounds. We will need, however, to remove some information protected by the attorney-client privilege. Sonya will be leading this project, and she will let you know when the CD is available.

Chad

Chad W. Moeller
Neal, Gerber & Eisenberg LLP
2 North LaSalle Street, Suite 2200
Chicago, Illinois 60602
(312) 269-5370 (direct)
(312) 750-6452 (direct fax)
cmoeller@ngelaw.com

---

**From:** Moeller, Chad W.
**Sent:** Friday, May 30, 2008 12:16 PM
**To:** Rothstein, Ron
**Subject:** Summary of Rule 37 conference

Ron:

This will confirm what we discussed during our Rule 37 telephone conference today. Please let me know if I have

inaccurately described what we discussed.

First, you indicated that you would check with your client about the status of the documents that it has yet to produce.  In light of the fact that we have not received any documents, you and I agreed to hold in abeyance, for now, our objections to your responses to our requests for production.

Second, we discussed our objections to your answers to interrogatory nos. 4, 7, 8, 9, 11, 16, 17, 18, 20, 21 and 22.  You agreed to answer nos. 7 and 8 and stated that, to the extent possible, you would identify which of the information in your answers to nos. 7 and 8 is also responsive to nos. 9, 11 and 20.  You also agreed to answer interrogatory nos. 17, 18 and 21.  You stated that you will not answer nos. 4, 16 or 22.

I look forward to receiving the documents and supplemental information.

Regards,

Chad


Chad W. Moeller
Neal, Gerber & Eisenberg LLP
2 North LaSalle Street, Suite 2200
Chicago, Illinois 60602
(312) 269-5370 (direct)
(312) 750-6452 (direct fax)
cmoeller@ngelaw.com

# Exhibit L

**Rosenberg, Sonya**

**Subject:**          RE: Carlton's document production

```
----- Original Message -----
From: Rothstein, Ron <RRothste@winston.com>
To: Moeller, Chad W.
Sent: Mon Jul 07 07:45:09 2008
Subject: RE: Carlton's document production
```

Chad, I'm in a deposition in New York today and then will be in LA defending depositions unitl Friday.  Can you send me any specific documents you  think you need before the mediation, that you do not already have.  I can forward your request to my client and hope to get you what you are looking for more quickly that trying to respond to your email point by point.

---

> From: Moeller, Chad W. [mailto:cmoeller@ngelaw.com]
> Sent: Thursday, July 03, 2008 3:30 PM
> To: Rothstein, Ron
> Cc: Dickman, John M.; Frederick, Sheila P.
> Subject: Carlton's document production
>
>     Ron:
>
>     Even a quick review of your client's document "production" establishes that it is deficient.  As an initial matter, you have failed to designate which documents are responsive to which requests, which makes it impossible for us to determine which requests you have have actually responded to.  As an example of your client's stubborn refusal to comply with the Federal Rules of Civil Procedure, and as we have discussed on several occasions (including during our Rule 37 conference on May 30), your client has yet to produce a list of its "Clients" that Mr. Grafstein was barred from soliciting under the terms of his Employment Agreement.  The term "Client" is defined under the Employment Agreement as "any person or entity from whom Employer performed services or sold equipment within a twelve (12) month period prior to the termination of employee's employment." (Paragraph 10).  We are entitled to this information and the other information we have sought, in advance of the settlement conference.
>
>     I am not inclined to keep repeating our same discovery-related points that you and I have exhaustively discussed.  I direct you to my Rule 37 letter and the email, below, summarizing our Rule 37 conference.  As you know, I am out of the office next week. Please work with Sonya Rosenberg about supplementing your discovery responses as you committed during the Rule 37 conference (see below).  We will expect your supplemental responses no later than Friday, July 11.  Meanwhile, I have instructed Sonya to start preparing a Motion to Compel and for Fees.  We will file the Motion upon my return to the office on July 14.
>
>     Finally, we should be in a position next week to produce the Elijah CD.  At this point, I do not anticipate that we will be withholding anything on relevancy grounds.  We will need, however, to remove some information protected by the attorney-client privilege. Sonya will be leading this project, and she will let you know when the CD is available.
>
>     Chad
>
>     Chad W. Moeller
>     Neal, Gerber & Eisenberg LLP
>     2 North LaSalle Street, Suite 2200
>     Chicago, Illinois 60602
>     (312) 269-5370 (direct)
>     (312) 750-6452 (direct fax)

cmoeller@ngelaw.com

---

From: Moeller, Chad W.
Sent: Friday, May 30, 2008 12:16 PM
To: Rothstein, Ron
Subject: Summary of Rule 37 conference


Ron:

   This will confirm what we discussed during our Rule 37 telephone conference today.
Please let me know if I have inaccurately described what we discussed.

   First, you indicated that you would check with your client about the status of the
documents that it has yet to produce.  In light of the fact that we have not received any
documents, you and I agreed to hold in abeyance, for now, our objections to your responses
to our requests for production.

   Second, we discussed our objections to your answers to interrogatory nos. 4, 7, 8,
9, 11, 16, 17, 18, 20, 21 and 22.  You agreed to answer nos. 7 and 8 and stated that, to
the extent possible, you would identify which of the information in your answers to nos. 7
and 8 is also responsive to nos. 9, 11 and 20.  You also agreed to answer interrogatory
nos. 17, 18 and 21.  You stated that you will not answer nos. 4, 16 or 22.

   I look forward to receiving the documents and supplemental information.

   Regards,

   Chad


   Chad W. Moeller
   Neal, Gerber & Eisenberg LLP
   2 North LaSalle Street, Suite 2200
   Chicago, Illinois 60602
   (312) 269-5370 (direct)
   (312) 750-6452 (direct fax)
   cmoeller@ngelaw.com


The contents of this message may be privileged and confidential. Therefore, if this
message has been received in error, please delete it without reading it. Your receipt of
this message is not intended to waive any applicable privilege. Please do not disseminate
this message without the permission of the author.
********************************************************************
Any tax advice contained in this email was not intended to be used, and cannot be used, by
you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as
amended.

# Exhibit M

received it in error, please notify the sender by reply e-mail and immediately delete it and any attachments without copying or further transmitting the same.

---

**From:** Rothstein, Ron [mailto:RRothste@winston.com]
**Sent:** Wednesday, July 09, 2008 7:53 PM
**To:** Rosenberg, Sonya
**Cc:** Moeller, Chad W.; Kelber, Michael G.
**Subject:** RE: Carlton v. Grafstein: discovery matters

Sonya, your response is not helpful. Please go to the trouble of identifying specific documents you need for mediation purposes. I'm out of the office until Friday. I have asked an associate to follow up with our client but some additional specificity would benefit you and your client in preparing for the upcoming mediation. Ron

---

**From:** Rosenberg, Sonya [mailto:srosenberg@ngelaw.com]
**Sent:** Wednesday, July 09, 2008 9:46 AM
**To:** Rothstein, Ron
**Cc:** Moeller, Chad W.; Kelber, Michael G.
**Subject:** Carlton v. Grafstein: discovery matters

Ron:

As you know, Chad is out of the office this week. I understand that you contacted him in response to his e-mail correspondence from July 3, 2008, to let him know that you are traveling for depositions this week and to ask for a list of specific documents that we think we will need prior to mediation.

Our request for all documents responsive to our discovery requests still stands. For your reference, I have attached a copy of our document requests dated April 11, 2008, and our Rule 37 letter dated May 15, 2008.

A closer review of the first document production that we received from you on July 3, 2008, reveals that it is wholly inadequate. Aside from a copy of Carlton's electronic communications policy and a single e-mail from Jeff (documents that comprise approximately a handful of pages), the rest of the production -- over 600 pages -- consists of what appear to be automatically generated IT lists of some sort, the meaning of which is impossible to ascertain without any explanation or designation from you.

We are entitled to and believe that we will need to review prior to the mediation all the discovery that we have requested. But, if based on your review of your client's documents, you believe that there is a way to narrow the production and still provide us with the substance of our requests, as identified in our First Request for Production of Documents, our Rule 37 letter, and your numerous subsequent written and verbal communications with Chad, we will, of course, consider your suggestions in good faith.

Should you have any questions, please do not hesitate to contact us.

Thanks,
Sonya

Sonya Rosenberg
NEAL ▪ GERBER ▪ EISENBERG
Neal, Gerber & Eisenberg LLP
Two North LaSalle Street ▪ Suite 2200
Chicago IL ▪ 60602-3801
312.827.1076 phone
312.980.0740 fax
srosenberg@ngelaw.com ▪ www.ngelaw.com

*Please consider the environment before printing this e-mail.*

7/14/2008

Confidentiality Notice: This communication is confidential and may contain privileged information. If you have received it in error, please notify the sender by reply e-mail and immediately delete it and any attachments without copying or further transmitting the same.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.
*************************************************************************
Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

# Exhibit N

## Rosenberg, Sonya

**From:** Rosenberg, Sonya
**Sent:** Thursday, July 10, 2008 8:11 PM
**To:** 'Rothstein, Ron'
**Cc:** Moeller, Chad W.; Kelber, Michael G.
**Subject:** RE: Carlton v. Grafstein: discovery matters

Ron:

I am frankly puzzled as to what additional identification you are seeking as we have, time and again, reiterated our discovery requests to you in exhaustive detail. But, in an effort to help you to streamline your production given your travels (something, I note, we are not required to do), here is a very brief summary of the information we have requested from you on multiple occasions and believe we are entitled to review and will, at the very minimum, need to review prior to mediation:

- A list of Carlton's "Clients" that Plaintiff claims Mr. Grafstein was barred from soliciting under the terms of his Employment Agreement. As a reminder, the term "Client" is defined under the Employment Agreement as "any person or entity for whom Employer performed services or sold equipment within a twelve (12) month period prior to the termination of the employee's employment."
- A list of Carlton's Clients that Plaintiff claims Defendants solicited in violation of their legal obligations.
- Copies of all documents and information that Plaintiff claims is confidential, proprietary, and/or a trade secret that Defendants allegedly misappropriated.
- Documentation supporting Plaintiff's Complaint allegation that Mr. Grafstein intentionally diverted business leads from Carlton.
- Documentation supporting Plaintiff's Complaint allegation under the CFAA that it has made "payments for measures at discovering the extent and consequences of Grafstein's unauthorized activities and damages to the integrity of of [Carlton's computer] data."
- All other documentation supporting any damages that Plaintiff alleges to have suffered as a result of any of Defendants' allegedly unlawful activities.

Please note that the above list is not intended to replace or supersede Defendants' initial discovery requests served on you on April 11, or the reiteration of many of these requests made in our Rule 37 letter, Rule 37 conference, and subsequent numerous verbal and written communications that you exchanged with Chad. Our request in the e-mail below for all documents responsive to our discovery requests still stands. If you have any questions as to what that means, please consult our initial discovery requests, our Rule 37 correspondence, and/or the numerous discovery-related e-mails we have sent you.

As we have reiterated to you on numerous occasions -- and, at this point, though almost *two months* have passed since your deadline to respond to our initial discovery requests -- you have yet to comply with our discovery requests in any meaningful way. We hope that the above list will help you in compiling the requested discovery and in complying with your obligations under the Federal Rules.

Should you have any questions, please do not hesitate to contact me (or have your associate contact me).

Thanks,
Sonya

Sonya Rosenberg
312-827-1076

*Please consider the environment before printing this e-mail.*

Confidentiality Notice: This communication is confidential and may contain privileged information. If you have

received it in error, please notify the sender by reply e-mail and immediately delete it and any attachments without copying or further transmitting the same.

**From:** Rothstein, Ron [mailto:RRothste@winston.com]
**Sent:** Wednesday, July 09, 2008 7:53 PM
**To:** Rosenberg, Sonya
**Cc:** Moeller, Chad W.; Kelber, Michael G.
**Subject:** RE: Carlton v. Grafstein: discovery matters

Sonya, your response is not helpful.  Please go to the trouble of identifying specific documents you need for mediation  purposes.  I'm out of the office until Friday.  I have asked an associate to follow up with our client but some additional specificity would benefit you and your client in preparing for the upcoming mediation.  Ron

**From:** Rosenberg, Sonya [mailto:srosenberg@ngelaw.com]
**Sent:** Wednesday, July 09, 2008 9:46 AM
**To:** Rothstein, Ron
**Cc:** Moeller, Chad W.; Kelber, Michael G.
**Subject:** Carlton v. Grafstein: discovery matters

Ron:

As you know, Chad is out of the office this week.  I understand that you contacted him in response to his e-mail correspondence from July 3, 2008, to let him know that you are traveling for depositions this week and to ask for a list of specific documents that we think we will need prior to mediation.

Our request for all documents responsive to our discovery requests still stands.  For your reference, I have attached a copy of our document requests dated April 11, 2008, and our Rule 37 letter dated May 15, 2008.

A closer review of the first document production that we received from you on July 3, 2008, reveals that it is wholly inadequate.  Aside from a copy of Carlton's electronic communications policy and a single e-mail from Jeff (documents that comprise approximately a handful of pages), the rest of the production -- over 600 pages -- consists of what appear to be automatically generated IT lists of some sort, the meaning of which is impossible to ascertain without any explanation or designation from you.

We are entitled to and believe that we will need to review prior to the mediation all the discovery that we have requested.  But, if based on your review of your client's documents, you believe that there is a way to narrow the production and still provide us with the substance of our requests, as identified in our First Request for Production of Documents, our Rule 37 letter, and your numerous subsequent written and verbal communications with Chad, we will, of course, consider your suggestions in good faith.

Should you have any questions, please do not hesitate to contact us.

Thanks,
Sonya

Sonya Rosenberg
NEAL ▪ GERBER ▪ EISENBERG
Neal, Gerber & Eisenberg LLP
Two North LaSalle Street ▪ Suite 2200
Chicago IL ▪ 60602-3801
312.827.1076 phone
312.980.0740 fax
srosenberg@ngelaw.com ▪ www.ngelaw.com

*Please consider the environment before printing this e-mail.*

Confidentiality Notice: This communication is confidential and may contain privileged information. If you have received it in error, please notify the sender by reply e-mail and immediately delete it and any attachments without copying or further transmitting the same.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.
********************************************************************
Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

# Exhibit O

LEXSEE 2007 U.S. DIST. LEXIS 39639

**AMERICAN HARDWARE MANUFACTURERS ASSOCIATION, Plaintiff, vs. REED ELSEVIER INC., et al., Defendants. REED ELSEVIER INC., a Massachusetts corporation, Counter-plaintiff, vs. AMERICAN HARDWARE MANUFACTURERS ASSOCIATION, a Delaware not-for-profit corporation, TIMOTHY FARRELL, and WILLIAM P. FARRELL, SR., Counter-defendants.**

**No. 03 C 9421**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2007 U.S. Dist. LEXIS 39639*

**February 13, 2007, Decided**

**SUBSEQUENT HISTORY:** Objection denied by *Am. Hardware Mfrs. Ass'n v. Reed Elsevier Inc., 2007 U.S. Dist. LEXIS 35352 (N.D. Ill., May 11, 2007)*

**PRIOR HISTORY:** *Am. Hardware Mfrs. Ass'n v. Reed Elsevier Inc., 2007 U.S. Dist. LEXIS 10603 (N.D. Ill., Feb. 13, 2007)*

**COUNSEL:** [*1] For American Hardware Manufacturers Association, a Delaware not-for-profit corporation, Plaintiff: William Patrick Farrell, Jr., LEAD ATTORNEY, Michael Anthony Nicolas, Scott Jared Fisher, Neal, Gerber & Eisenberg, Chicago, IL; Gordon B. Nash, Jr., Drinker Biddle Gardner Carton (IL), Chicago, IL.

For Reed Elsevier, Inc., a Massachusetts corporation, Defendant: Michael I. Rothstein, LEAD ATTORNEY, Karina H. DeHayes, Reema Kapur, Tabet DiVito & Rothstein, LLC, Chicago, IL; Benjamin J. Randall, Randall & Kenig LLP, Chicago, IL; John Matthew Fitzgerald, Rachel Nicole Cruz, Tabet DiVito Rothstein, Chicago, IL; Timothy A. Hudson, Jenner & Block LLP, Chicago, IL.

For Reed Exhibitions, a division of Reed Elsevier, Inc., Defendant: Michael I. Rothstein, LEAD ATTORNEY, Reema Kapur, Tabet DiVito & Rothstein, LLC, Chicago, IL; Benjamin J. Randall, Randall & Kenig LLP, Chicago, IL.

For Association Expositions & Services, a division of Reed Elsevier, Inc., Defendant: Michael I. Rothstein, LEAD ATTORNEY, Reema Kapur, Tabet DiVito & Rothstein, LLC, Chicago, IL.

For Freeman Decorating Company, an Iowa corporation, Freeman Decorating Services, Inc., a Texas Corporation, also known [*2] as The Freeman Companies, Defendants: Anthony Joseph Carballo, LEAD ATTORNEY, Aren Lance Fairchild, Garry L Wills, Freeborn & Peters, Chicago, IL.

For William P. Farrell, Sr., Third Party Defendant: Gordon B. Nash, Jr., Drinker Biddle Gardner Carton (IL), Chicago, IL; Scott Jared Fisher, Neal, Gerber & Eisenberg, Chicago, IL.

For Reed Elsevier, Inc., a Massachusetts corporation, Counter Claimant: John Matthew Fitzgerald, Rachel Nicole Cruz, Tabet DiVito Rothstein, Chicago, IL; Reema Kapur, Tabet DiVito & Rothstein, LLC, Chicago, IL.

For Timothy S Farrell, Counter Defendant: William Patrick Farrell, Jr., LEAD ATTORNEY, Michael Anthony Nicolas, Scott Jared Fisher, Neal, Gerber & Eisenberg, Chicago, IL; Gordon B. Nash, Jr., Drinker Biddle Gardner Carton (IL), Chicago, IL.

For William P. Farrell, Sr., American Hardware Manufacturers Association, a Delaware not-for-profit corporation, William P. Farrell, Sr., Counter Defendants:

2007 U.S. Dist. LEXIS 39639, *2

Michael Anthony Nicolas, Neal, Gerber & Eisenberg, Chicago, IL.

For Freeman Decorating Company, an Iowa corporation, Freeman Decorating Services, Inc., a Texas Corporation, Counter Claimants: Garry L Wills, Freeborn & Peters, Chicago, IL. **[*3]**

**JUDGES:** JAMES B. MORAN, Senior Judge.

**OPINION BY:** JAMES B. MORAN

**OPINION**

MEMORANDUM OPINION AND ORDER

Plaintiff American Hardware Manufacturers Association ("AHMA") brought suit against Reed Elsevier, Inc., Reed Exhibitions, and Association Expositions & Services (collectively "Reed"), and Freeman Decorating Co., and Freeman Decorating Services, Inc. (collectively "Freeman"), alleging various counts of common law and statutory breaches stemming from the breakdown of plaintiff's business relationships with defendants. [1] Subsequently, Reed filed counterclaims against AHMA and Timothy S. Farrell and William Farrell ("Farrells"). In April 2005, the matter was referred to Magistrate Judge Levin for all discovery motions and supervision, and, subsequently, was reassigned to Magistrate Judge Mason. Since then, Judge Mason has presided over extensive motion practice regarding discovery disputes. Today we deal with a series of objections to Judge Mason's rulings. Specifically, Reed and Freeman (collectively "defendants") object to the magistrate judge's related orders of July 24, 2006, September 14, 2006, and September 18, 2006, and related orders of September 26, 2006, and October 17, 2006.

> 1   For a complete factual background, see *American Hardware Manufacturers Association v. Reed Elsevier, Inc., 2004 U.S. Dist. LEXIS 28007 (N.D.Ill.2004).*

**[*4]** The first set of objections state defendants' contention that the magistrate judge erred in granting plaintiff's motion to compel Reed to produce documents regarding commissions received in connection with all of Reed's trade shows, granting plaintiff's motion to compel the production of Reed's general financial documentation without limiting the disclosure to Reed Exhibitions, and

denying Reed's motion to compel documents reflecting the payments and perks given to family members of counter-defendants William and Timothy Farrell. The second set of objections assert that the magistrate judge again erred in limiting defendants to a combined 15 depositions.

The orders at issue deal with discovery disputes and are non-dispositive. *Phillips v. Raymond Corp., 213 F.R.D. 521, 525 (N.D.Ill.2003); Bobkoski v. Board of Educ. of Cary Consol. School Dist. 26, 141 F.R.D. 88, 90 (N.D.Ill.1992).* Thus, the standard of review for considering whether to set aside the magistrate judge's orders is governed by *Federal Rule of Civil Procedure 72(a),* which sets a clearly erroneous standard of review. *Nat'l Educ. Corp. v. Martin, 1994 U.S. Dist. LEXIS 6935, 1994 WL 233661,* **[*5]** *\*1 (N.D.Ill.1994).* [2] A more extensive review would frustrate the purpose of referring discovery to a magistrate judge. *See id.* "Clearly erroneous" has been defined as a determination that upon assessing the evidence the reviewing court is "'left with the definite and firm conviction that a mistake has been committed.'" *Bobkoski, 141 F.R.D. at 90-91* (citing *United States v. United States Gypsum, 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948)). See also Thornton v. Brown, 47 F.3d 194, 196-97 (7th Cir.1995)* (defining "clearly erroneous" for *Fed.R.Civ.P. 52(a)* analysis, and noting that "[t]he trial court's choice between two permissible views of the evidence cannot be considered clearly erroneous"). [3]

> 2   *Fed.R.Civ.P. 72(a)* reads, in pertinent part: "The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law."
>
> 3   Defendants point to *Holland v. Island Creek Corp., 885 F.Supp.4 (D.D.C.1995)* to argue that "it is incumbent on this Court to review adopted findings against the record 'with particular, even painstaking care' where, as here, the Magistrate did not offer a reasoned explanation for his decision and merely adopted plaintiff's argument." (Reed's brief in support of objection to Magistrate Judge's discovery orders of July 24, 2006, September 14, 2006, and September 18, 2006). While *Holland* does, in fact, make such a statement, *Holland* was decided in a different district, guided by different circuit court

precedent. Defendants have not pointed us, nor have we found in our own search, similar language in the Seventh Circuit. The closest is Judge Shadur's suggestion that "[m]uch as the district judge should defer to the magistrate judge's decisions...he or she should not be hamstrung by the clearly erroneous standard.... [A]lthough an abuse-of-discretion attitude should apply to many discovery and related matters, it need not curtail the power of the district judge to make needed modifications in the magistrate judge's directives." *Phillips, 213 F.R.D. at 525 (N.D.Ill.2003)*.

[*6] We begin with defendants' contention that plaintiff should not be entitled to all documents related to Reed and Freeman's nationwide agreement. In his order of July 24, 2006, Judge Mason granted plaintiff's motion to compel defendants to produce all documents (including financial information reflecting any payments/exchanges, "commissions," in-kind benefits or signing bonuses) relating to Reed and Freeman's nationwide agreement(s) and any documents discussing such agreements. Judge Mason found that such documents were reasonably calculated to lead to the discovery of admissible evidence. In the same order Judge Mason denied plaintiff's motion to compel Reed's agreements with other associations or owners affiliated with trade shows, where Freeman paid Reed "commissions" and in-kind benefits, finding plaintiff's arguments insufficient to show that such discovery was reasonably calculated to lead to admissible evidence. In clarifying his order of July 24, 2006, in recognition of the "enormous amount of responsive material Reed and Freeman would have to collect, review and produce," Judge Mason limited plaintiff's discovery to financial information reflecting any payments/exchanges, "commissions, [*7] " in-kind benefits and signing bonuses, omitting from discovery routine performance communications. He also limited the discovery to the years 1997 and 1998, noting in a footnote that the court would revisit the import of additional discovery if and when AHMA demonstrated its benefit. Defendants ask this court to reverse Judge Mason's order granting plaintiff's motion to compel with respect to defendants' other trade shows, and to quash plaintiff's subpoenas to the other associations involved in such shows.

Reed argues that "[t]he mere fact that Reed and Freeman were parties to nationwide agreements does not entitle plaintiff to documents and information from Reed's other trade shows" (Reed's brief, at 7). Freeman contends that because there is no overlap between the commissions that Freeman paid for the National Hardware Show and the commissions for any other Freeman/Reed show, plaintiff cannot show that discovery of the nationwide agreements is reasonably calculated to lead to admissible evidence. In support, Freeman submitted the declaration of Linda Pilgrim, who was in charge of calculating the commission payments from Freeman to Reed in the years in question. Ms. Pilgrim averred: [*8] "My calculations of the commission payments for the individual Freeman/Reed shows, including the National Hardware Show ("NHS"), were solely based upon the Exhibitor Billing amounts for that particular show.... As a result, the calculation of the commissions for the NHS is separate from, and entirely unrelated to, anything to do with any of the other Reed/Freeman shows." Plaintiff's response suggests that defendants' are over-simplifying the rationale for plaintiff's request. Plaintiff clarifies that it seeks more than financial information necessary to trace the commissions allocated to Freeman by Reed with regard to the National Hardware Show. Rather, plaintiff desires such discovery to evidence that Reed leveraged the National Hardware Show to entice Freeman into the nationwide agreements. Plaintiff continues, "if AHMA is not permitted full discovery in connection with the Reed/Freeman agreements, AHMA will be left to essentially accept Reed and Freeman's litigation position on the impact and implications of their conduct" (plf's response, at 4-5).

*Rule 26(b)(1)* permits discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending [*9] action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party ... The information sought need not be admissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." For discovery purposes, relevance is broadly construed. *Behnia v. Shapiro, 176 F.R.D. 277, 280 (N.D.Ill.1997)* (citing *AM Int'l Inc. v. Eastman Kodak Co., 100 F.R.D. 255, 257 (N.D.Ill.1981))*. Defendants have admitted that Freeman paid Reed commissions pursuant to a nationwide agreement (*see, e.g.,* plf's response, exh. B, at P 3). Freeman, in fact, noted that "it paid lawful commissions to Reed in certain years pursuant to a 1998 nationwide contract that based the amount of the lawful

Case 1:07-cv-06757   Document 41-4   Filed 07/14/2008   Page 27 of 40

Page 4
2007 U.S. Dist. LEXIS 39639, *9

commissions on the total of the net exhibitor billings for all of the Reed/Freeman shows, including the National Hardware Show." (*Id.,* at PP 34, 35). Plaintiff has introduced evidence that the Reed/Freeman contracts were negotiated at a national, rather than individual, level (plf's response, exh. D, at 30). Therefore, plaintiff has submitted sufficient evidence to support Judge [*10] Mason's ruling that it is entitled to discovery of documents related to the nationwide agreement. *But cf. Cadillac Ins. Co. v. American Nat'l Bank, 1992 U.S. Dist. LEXIS 2815 (N.D.Ill.1992)* (conclusory allegation of commingling accounts was insufficient to persuade the court to broaden the scope of discovery by requiring production of otherwise irrelevant documentation). As the parties do not address the burden of production, and Judge Mason has already undertaken a balancing analysis, we will not disturb his order with respect to exactly what must be produced. In light of this, we also uphold Judge Mason's order regarding the seven subpoenas plaintiff issued to trade associations covered by the Reed/Freeman nationwide agreements.

We turn next to the dispute over the discovery of defendants' financial information. In Judge Mason's order of July 24, 2006, he granted plaintiff's motion to compel financial information relating to the National Hardware Show, Reed Exhibitions and Reed Elsevier, Inc., and Freeman Decorating Company. On September 14, 2006, upon consideration of defendants' motion to reconsider, Judge Mason limited plaintiff's discovery of Reed's financials [*11] to "information incorporating Reed Exhibitions" for 1997 and 1998. The magistrate judge again noted that discovery for additional years may be revisited in the future upon plaintiff's demonstration of good cause.

Reed now argues that Judge Mason's order remains unclear and asks this court to amend it to limit plaintiff's discovery to financial documents that "expressly mention Reed Exhibitions." Reed asserts: "In one sense, all of Reed Elsevier Inc.'s financial documents 'incorporate' Reed Exhibitions, since Reed Exhibitions is merely a division of Reed Elsevier Inc. In addition, most often, Reed's overall financial documents do not break out Reed Exhibitions' information. The information is simply an unidentified and non-segregated component of total numbers on Reed's general financial statements."

We do not find Reed's objections persuasive. Plaintiff's second amended complaint is replete with

allegations that Reed concealed the alleged kickbacks, commissions, and bribes from AHMA. (*See* 2d am.cplt., at PP 56, 87, 88, 90, 93, 94, 152). The allegations further note that such payments were concealed in Reed's accounting and financial data. (*See id.,* at PP 89, 95, 103, 154, [*12] 156). As Reed admits that Reed Elsevier Inc.'s financial documents account for and incorporate the financials of Reed Exhibitions, it is incumbent on Reed to produce such documents to plaintiff. Judge Mason has already weighed the balance of hardships, and in light of the massive amount of financial information documentation, limited the production to 1997 and 1998. We think such a limitation is sufficient. [4]

> 4   We note that any financial documents that have no reflection of Reed Exhibitions financials are outside the scope of plaintiff's discovery. Therefore, a financial statement of a division of Reed (*e.g.,* LexisNexis) that does not incorporate Reed Exhibitions is not discoverable. But financial documents of Reed Elsevier Inc., incorporating Reed Exhibitions, even if they do not expressly mention Reed Exhibitions, are discoverable.

Freeman also objects to plaintiff's request for the production of Freeman's tax returns and documentation related to the finances of the corporation as a whole. Freeman suggests [*13] that plaintiff's request is "purely and simply a fishing expedition," is irrelevant to plaintiff's claims or defendants' counterclaims, and is unduly burdensome. (Freeman's brief, at 8-10). Citing *Fields v. General Motor Corp., 1996 U.S. Dist. LEXIS 206, 1996 WL 14040, *4 (N.D.Ill.1996)*, Freeman argues that a taxpayer should not be compelled to disclose its income tax return information merely because it is a party to a lawsuit (*id.,* at 7). Freeman correctly notes that courts have been reticent to require parties to produce such documentation unless the litigant puts its income at issue. *Fields, 1996 U.S. Dist. LEXIS 206, 1996 WL 14040 at *4. See also Payne v. Howard, 75 F.R.D. 465, 470 (D.D.C.1977)* (denying motion to compel defendant's tax returns where plaintiff, not defendant, put defendant's income at issue). Courts have looked to *26 U.S.C. §§ 6103 and 7213(a)* to suggest that public policy warns against forcing disclosure of income tax returns, especially where the necessary information can be disclosed through other means. *Id.; Federal Sav. & Loan Ins. Corp. v. Krueger, 55 F.R.D. 512, 514 (N.D.Ill.1972)* (noting [*14] that the policy is "grounded in the interest

of the government in full disclosure of all the taxpayer's income which thereby maximizes revenue"). Traditional public policy and privacy concerns, however, are not at the forefront of this dispute. Generally, one party seeks its opponents tax returns to use the opponent's amount of income against him. Where, as here, plaintiff seeks Freeman's tax returns to show how Freeman concealed payments to Reed as deductible business expenses, disclosure of Freeman's tax returns "would not hinder the public policy of full and accurate disclosure of a taxpayer's income." *Houlihan v. Anderson-Stokes, Inc., 78 F.R.D. 232, 234 (D.D.C.1978). See also Shaver v. Yacht Outward Bound, 71 F.R.D. 561 (N.D.Ill.1976).* Additionally, the parties have entered into a series of protective orders, under which Freeman's tax returns can be disclosed. *See American Air Filter Co., Inc. v. Kannapell, 1990 U.S. Dist. LEXIS 11842, 1990 WL 137385, *4 (D.D.C. 1990)* (noting that privacy concerns were abated where plaintiff offered to sign a confidentiality stipulation whereby defendant's tax returns would not be disclosed to anyone other than counsel).

[*15] Like Judge Mason, we find Freeman's tax returns relevant to plaintiff's claims. For example, plaintiff's second amended complaint asserts, "Freeman's deceptive course of conduct, which included (a) paying undisclosed kickbacks -- disguised as commissions or rebates -- to Reed in return for being hired as general contractor for the Show, ...(c) paying bribes to Reed in exchange for the lucrative general contractor position for the Show, and (d) the concealment, suppression and omission of material facts from AHMA, with the intent that AHMA rely upon the concealment, suppression or omission of such material facts, constitutes deceptive practices under the Consumer Fraud Act and is the type of conduct that the Act was created to remedy." (2<nd> am.cplt., P 104). Also noting the deposition testimony of Mr. Beaudin, Freeman's 30(b)(6) witness, indicating that (1) Freeman Decorating Services, Inc. does not file a federal tax return, (2) Freeman Decorating Company does file a federal tax return, (3) Freeman Decorating Company's tax return reflects the accounts and performance of Freeman Decorating Services, Inc., and (4) Freeman treated the commissions it received from Reed as tax deductible [*16] business expenses (Beaudin dep, at pp. 71-72), we find that plaintiff is entitled to discover Freeman's tax returns for the relevant years.

Freeman's objection to produce financial

documentation related to the company as a whole is also rejected. Freeman's argument centers on the burden it will face in producing such documents, compared to the limited benefit to plaintiff. Judge Mason accounted for such a burden and limited the production to the years 1997 and 1998. We see no reason to disturb his finding. *See American Dental Ass'n Health Foundation v. Bisco, Inc., 1992 U.S. Dist. LEXIS 7226, 1992 WL 107299, *3 (N.D.Ill.1992)* (a magistrate judge's failure to articulate his or her reasoning is, by itself, insufficient to require a remand, especially when there is no evidence that the analysis was conducted in anything but a careful manner).

Next, we turn to defendants' objections to Judge Mason's order denying defendants' motion to compel with respect to (1) documents reflecting AHMA's payments or perks to other Farrell family members, and any entities in which they were shareholders, partners or employees; and (2) documents reflecting the amount of legal fees paid to a law firm at which [*17] William Farrell, Sr.'s son, William Farrell, Jr., was a partner. In Judge Mason's order of July 24, 2006, he denied defendants' requests to obtain discovery from the family members of the individual counter-defendants as irrelevant to the issues presented in the case. Defendants assert that the judge erred in his relevancy determination, arguing that the payments and perks to counter-defendants' families are relevant to defendants' defamation counterclaim, specifically to individual counter-defendants' bad faith motive in filing this suit. Defendants further argue that the payments to William Farrell, Jr.'s law firm are relevant to bias and damages.

Plaintiff argues that defendants' objections are untimely, as they were filed on September 29, 2006, in response to Judge Mason's order of July 24, 2006. The Federal Rules of Civil Procedure require that any objections to a magistrate judge's order be filed within ten days of the order (*Rule 72(a)*). We are, however, persuaded that where, as here, the magistrate judge was considering a motion to clarify or reconsider, the ten days should not begin to run until the magistrate judge comes to a final conclusion. *See Epperly v. Lehmann Co., 161 F.R.D. 72, 74 (S.D.Ind.1994)* [*18] (relying on *Comeau v. Rupp, 142 F.R.D. 683, 685-86 (D.Kan.1992))*. Therefore, defendants would be granted ten days from the date of Judge Mason's order on reconsideration, filed September 14, 2006. Defendants argue that they properly excluded weekends and the date of ruling to arrive at the

Case 1:07-cv-06757   Document 41-4   Filed 07/14/2008   Page 29 of 40

Page 6
2007 U.S. Dist. LEXIS 39639, *18

September 29, 2004 objection filing date. Defendants incorrectly note that Judge Mason filed his reconsideration order on September 15, 2006. Rather, he filed the order on September 14, 2006. Discounting weekends, defendants' objections were due September 28, 2004.

Because the magistrate judge's order was mailed to the parties, however, *Rule 6(e)* adds three mailing days onto the length of time necessary to object. Not counting weekends and holidays, that would allow defendants until October 3, 2006, to object. Counting holidays and weekends, defendants' objections would be timely on or before September 27, 2006. There is a debate over whether the ten-day period includes weekends and holidays where, as here, the magistrate judge mailed his order to counsel of record. The issue involves an analysis of the interplay between *Rules 72(a), 6(a)*, and *6(e)*. In *THK America, Inc. v. NSK Ltd., 157 F.R.D. 651 (N.D.Ill.1994)*, **[*19]** Judge Norgle held that where the magistrate judge mailed his order to counsel, the application of *Rule 6(e)* extended the time to file objections to 13 days. This, Judge Norgle noted, took the defendants' objections out of *Rule 6(a)*, and therefore the 13-day time period included holidays and weekends. Other courts disagree, and commence the ten-day period at the end of the three-day mailing period. *See Epperly, 161 F.R.D. at 75-76*. While both sides have persuasive arguments, because Judge Mason's order did not clearly state the filing deadlines for objections (*but cf. THK America, Inc., 157 F.R.D. at 654*), we will proceed to address the merits of defendants' objections.

Defendants contend that counter-defendants put the disputed discovery at issue in asserting the affirmative defense of business judgment rule and right of fair comment on a matter of public interest to defendants' defamation counterclaim. Defendants assert that they are "entitled to defeat these affirmative defenses by demonstrating that AHMA and its officers, the Farrells, abused the privilege through bad faith and improper motivation" (Reed's brief, at 11). Specifically, defendants **[*20]** contend that they are entitled to discovery to prove "that AHMA's motivation in filing the lawsuit was to defame Reed in order to protect the Farrell family's receipt of payments and perks" (Reed's brief, at 11).

In Illinois, a party defending against a defamation suit may be entitled to a qualified or conditional privilege. In *Kuwik v. Starmark Star Marketing and Administration, Inc., 156 Ill. 2d 16, 619 N.E.2d 129, 188 Ill. Dec. 765 (Ill.1993)*, the Illinois Supreme Court rejected the previously used two-part test for conditional privilege, whereby (1) the judge determined, as a matter of law, whether defendant acted in good faith by applying a five-part test (including a determination of good faith) to determine whether the privilege applied, and then (2) the fact-finder determined whether the defendant acted with malice to defeat the privilege. Instead, the *Kuwik* court held that the judge should determine whether the occasion was conditionally privileged and then the fact-finder should determine whether the defendant abused such a privilege. *Id.* For our practical purposes, the change means that the *Kuwik* court took the good faith determination out of the initial determination and wrapped **[*21]** it into the jury's determination of abuse of privilege. The Kuwik court explained, "to prove an abuse of the qualified privilege, the plaintiff must show 'a direct intention to injure another, or *** a reckless disregard of [the defamed party's] rights and of the consequences that may result to him.'" *Id., at 135-36* (quoting *Bratt v. Int'l Business Machines Corp., 392 Mass. 508, 467 N.E.2d 126, 131 (Mass.1961))*. The Illinois Supreme Court continued: "Thus, an abuse of a qualified privilege may consist of any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties." *Id.*

Essentially, defendants argue that (1) counter-defendants defamed Reed by filing this lawsuit; (2) the suit was filed in bad faith and with improper motivation to protect counter-defendants' and their families' perks and payments associated with the hardware show; (3) the bad faith defeats counter-defendants' affirmative defenses of qualified or conditional privileges; and (4) thus the amount of the perks and payment (the self-enrichment) **[*22]** is relevant to defendants' counterclaims or at least likely to lead to admissible evidence. Specifically, Reed asserts, "[t]he lengths to which AHMA and its officers would go to protect the Farrell family fortune can only be explored by determining through discovery how much AHMA paid to all family members -- whether it was in salary, gifts, perks, cars, or legal fees paid to the firm in which William Farrell, Jr. was a partner. The higher the amount AHMA stood to lose if its 2004 show failed and Reed's 2004 National Hardware Show succeeded, the more likely it is that this litigation was filed only to allow

AHMA to defame Reed and attempt to hide behind the veil of various conditional privileges to defamation" (Reed's brief, at 13).

Under *Kuwik*, "it is the province of the trier of fact to determine whether the qualified privilege has been abused by examining the facts of a particular case, including whether the defendant acted in good faith." *Girsberger v. Kresz, 261 Ill. App. 3d 398, 633 N.E.2d 781, 794, 198 Ill. Dec. 940 (Ill.App.Ct.1993)*. As we noted above, *Rule 26* permits comprehensive discovery, and relevance is construed broadly. It is our view that it is possible that discovery of the payments [*23] and perks to the Farrell family members could lead to admissible evidence helpful to a jury in determining whether counter-defendants abused their conditional privilege as to Reed's defamation claims. Therefore, we reverse Judge Mason's denial of defendants' motion to compel.

Finally, we turn to defendants' motions objecting to Judge Mason's order restricting their depositions. The procedural history of this motion is complicated and very well briefed. After an inability to agree on the number of depositions due each side, plaintiff (AHMA) and counter-defendants (Farrells) moved to collectively take 30 depositions. Without response from Reed, Judge Mason determined that the number of depositions taken in the case should be limited to 45. Confusion regarding the allocation of the 45 depositions ensued, and Reed and Freeman moved for clarification. [5] Judge Mason, in an order dated September 26, 2006, clarified: AHMA was entitled to 15 depositions, Farrells to 15 depositions, and Reed and Freeman, collectively, to 15 depositions. On October 12, 2006, Reed and Freeman filed two motions, one before this court and the other before the magistrate judge. The motion before this court was [*24] an objection to Judge Mason's September 26, 2006, order. The motion before Judge Mason was an affirmative request from Reed and Freeman to increase the number of their depositions to 30. On October 17, 2006, Judge Mason denied Reed and Freeman's request for additional depositions, but noted: "Nevertheless, if, after taking fifteen depositions allotted, Reed and Freeman demonstrate that good cause exists to exceed fifteen depositions, we will revisit the issue." In the meantime, the parties briefed Reed and Freeman's objections to Judge Mason's September 26, 2006, order. Before we had an opportunity to take a look at those briefings, Reed and Freeman filed their objections to Judge Mason's October 17, 2006, order, to be consolidated with their objections

filed to his September 26, 2006, order. An opposition brief filed by AHMA and Farrells arrived on November 11, 2006, and the issues became ripe for determination.

5    Reed and Freeman believed Judge Mason awarded them, collectively, 25 depositions, and AHMA and Farrells, collectively, 20 depositions. AHMA and Farrells understood Judge Mason's order to grant AHMA 15 depositions, Farrells 15 depositions, and Reed and Freeman, collectively, 15 depositions.

[*25] A lot of paperwork boils down to a small number of arguments from Reed and Freeman that Judge Mason's decision to restrict their depositions to 15 was clearly erroneous. None is persuasive. First, defendants argue that because Judge Mason did not wait for a response to AHMA and Farrells' request for 30 depositions before he ruled, the September 26, 2006, order was clearly erroneous. We disagree. *Rule 26(b)(2)* allows the court to alter the number of depositions (ten) guaranteed under *Rule 30(a)(2)(A)*. The Advisory Committee notes from 1983 state, "The court may act on motion, or its own initiative." Furthermore, Reed and Freeman subsequently filed an affirmative request for 30 depositions, which was considered and rejected by Judge Mason. Their arguments have been given their fair due.

Second, defendants argue that the allocation of depositions is unfair. Their inequity argument, in addition to asserting a general sense of unfairness, indicates that because their interests are not as aligned as AHMA and Farrells' are, they should be entitled to at least as many depositions. We do not find Judge Mason's ruling clearly erroneous. The 1983 Advisory Committee notes regarding *Rule 26(b)(2)* [*26] state: "The new sentence is intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse.... But the court must be careful not to deprive a party of discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case." We think Judge Mason conformed to both sentences, without error. He limited the parties' depositions to fifteen each, [6] and allowed Reed and Freeman the opportunity to revisit the issue in the future upon a showing of good cause. No more is necessary. Further, Reed and Freeman have generally presented a united front in approaching their defense. Therefore, although they may be separate entities, their interests are generally aligned.

6    *Rule 30(a)(2)(A)* defines the deposing parties

to be (1) plaintiffs, (2) defendants, and (3) third party defendants. Here, AHMA is the plaintiff, Reed and Freeman are the defendants, and Farrells are the third party defendants. Judge Mason granted each party 15 depositions, and specified that AHMA and the Farrells could not share their allocation. Defendants assert that Judge Mason's conformance with the Federal Rules of Civil Procedure elevates form over substance. We disagree.

[*27] Third, defendants contend that the extent and complexity of the case requires extra depositions. We must weigh the benefit to defendants of additional discovery against the cost and burden to all of the parties of participating in such discovery. Judge Mason is well aware of the issues and claims in this case, as well as the resources and requests of each party. He is in the best position to weigh the benefits against the burdens, and we see no reason to reverse his determination. Therefore, we deny defendants' objections to the magistrate judge's order restricting their depositions to 15. Each party should pay its own costs associated with this motion.

CONCLUSION

For the reasons stated herein, we affirm the magistrate judge's orders with respect to plaintiff's motion to compel Reed to produce documents regarding commissions received in connection with all of Reed's trade shows, plaintiff's motion to compel the production of Reed's general financial documentation, without limiting the disclosure to Reed Exhibitions, and defendants' motion for leave to take 30 depositions. We reverse the magistrate judge's orders with respect to Reed's motion to compel documents reflecting AHMA's [*28] payments and perks given to family members of counter-defendants William Farrell, Sr. and Timothy Farrell.

JAMES B. MORAN

Senior Judge, U. S. District Court

Feb. 13, 2007.

# Exhibit P

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is entered into as of February 21st, 2002 by and between Carlton Technologies, Inc. ("the Employer"), 2000 W. Fulton Street, Chicago, Illinois 60612, and Jeff Grafstein ("the Employee").

A.    Employer is engaged in the business of purchasing, reconditioning and selling product scanners, cash registers and similar devices used at the point of sale in the retail industry and performing services such as refurbishing equipment for others; and

B.    Employer has invested a substantial amount of time and resources in developing its business and marketing techniques and in obtaining and maintaining its client and referral base and Employer desires to protect its confidential information and confidential programs and its client base; and

C.    Employer desires to retain the services of the Employee and for Employee to assist Employer in developing and maintaining its client base and its business; and

D.    Employee is willing to be employed by Employer.

Therefore, the parties agree as follows:

1.    **Employment.**    Employer shall employ Employee as a Sr. Account Executive and Director of Wireless Data Collection and Scanning Devices. Employee's duties are set forth on Exhibit "A". Employee accepts and agrees to such employment, subject to the general supervision, advice and direction of Employer and the Employer's supervisory personnel. Employee shall also perform such other duties Employer requests Employee to perform. Employee shall also follow all rules of Employer.

2.    **At Will Employment.**    Your employment with Employer is entered into voluntarily, and you are free to terminate your employment at any time, with or without a reason. Similarly, the Employer has the right to terminate your employment at any time, with or without a reason. Although the Employer may choose to terminate your employment for cause, cause is not required. This is called "at-will" employment. While it is expected that our working relationship will be mutually satisfactory, neither you, nor the Employer, have entered into any express or implied contract of employment for any specified period of time. No one other than the President of the Company that employs you can enter into an agreement for employment for a specified period of time, or make any agreement or representation contrary to the at-will employment policy. The Employer's policy of at-will employment can be changed only in a writing signed by the President of the Company that employs you.

3.    **Best Efforts of Employee.**    Employee agrees to perform faithfully, industriously, and to the best of Employee's ability, experience, and talents, all of the duties that may be required by the express and implicit terms of this Agreement, to the reasonable satisfaction of Employer. Such duties shall be provided at such place(s) as the needs, business, or opportunities of the Employer may require from time to time.

4.    **Compensation of Employee.**    As compensation for the services provided by Employee under this Agreement, Employer will pay Employee such compensation as reflected on Exhibit "A". Payments will be made at such payment cycles as the Employer shall determine. Upon termination of this Agreement, payments under this paragraph shall cease; provided, however, that the Employee shall be entitled to payments for periods or partial periods of work that occurred prior to the date of termination and for which the Employee has not yet been paid. Accrued vacation time will be paid in accordance with state law and the Employer's customary procedures.

5.    **Absence from Work and Tardiness.**    Employer understands that family emergencies and sickness occur which may occasionally require that Employee miss work. In such an event, it is expected that

GRAF04893

Employee provide Employer with as much notice as possible of an absence due to an emergency or sickness. Employer may require, in Employer's sole discretion, a note from a physician to verify an illness. Regular full-time employees are entitled to five (5) sick days with pay per year. Sick days are not vacation days and are only to be utilized in the event of a family emergency or an illness which renders Employee incapable of attending work. Sick days may not be carried over from one year to another and Employee is not entitled to receive any pay for unused sick days. Unexcused or excessive absences are grounds for immediate dismissal. Each Employee has a start time. Employee is expected to be at work and ready to begin working at his/her customary start time. Excessive tardiness is grounds for immediate dismissal.

6.    **Reimbursement for Expenses in Accordance with Employer Policy.**  The Employer will only reimburse Employee for approved out-of-pocket expenses in accordance with Employer policies in effect from time to time.

7.    **Recommendations for Improving Operations.**    Employee shall provide Employer with all information, suggestions, and recommendations regarding Employer's business, of which Employee has knowledge, that will be of benefit to Employer.

8.    **Confidentiality.**   Employee recognizes that Employer has and will have information regarding the following:

- products
- margins
- discounts
- business affairs
- marketing plans

- prices
- costs
- future plans
- costs
- customer lists

and other vital information (collectively "Confidential Information") which is valuable, special and unique assets of Employer. Employee agrees that the Employee will not at any time or in any manner, either directly or indirectly, divulge, disclose, or communicate in any manner any Confidential Information to any third party even if such Confidential Information was developed by the Employee during the term of employment of Employee or obtained during or after the term of employment of Employee, without the prior written consent of the Employer. Employee will protect the information and treat it as strictly confidential.  A violation by Employee of this paragraph shall be a material violation of this Agreement and, in the event of a violation, Employer shall be entitled to both legal and equitable relief. Employee acknowledges and agrees that the sale or unauthorized use or disclosure by Employee of any Confidential Information of the Employer constitutes unfair competition, and during the term of his employment with the Employer and thereafter, Employee will not engage in any unfair competition with the Employer by directly or indirectly using the Confidential Information, nor will Employee directly or indirectly disclose, publish or make use of, nor authorize anyone else to use Confidential Information or any information or knowledge which in any way relates to the business, product or services of the Employer.

9.    **Other Employees.**    Employee agrees for a period of two (2) years after the end of his/her employment with the Employer that Employee will not solicit for Employee's benefit or for the benefit of another business or enterprise any person employed by the Employer within six (6) months of Employee's last date of employment.

10.    **Non-Solicitation.**   In order to protect Employer's longstanding business relationships, Employee agrees that he/she will not, for a period of one hundred and eighty days (180) after his/her employment with Employer ceases for any reason, solicit, directly or indirectly, whether for Employee or as an officer, director, employee, agent or independent contractor of another, for purposes of performing any services or furnishing any equipment of a type similar to that provided by Employer to any client of Employer for whom Employee had contact with during the term of Employee's employment or any person or entity that Employee learned about or obtained any information concerning said person or entity's need for equipment or services as a result of Employee's employment.

2

GRAF04894

"Client," as used herein, shall mean any person or entity for whom Employer performed services or sold equipment within a twelve (12) month period prior to the termination of employee's employment.

**11.　　Injunction.**　Employee agrees that should he/she breach any provision of this Agreement, Employer will suffer irreparable injury and will have no adequate remedy at law. In such an event, Employer shall be entitled to obtain temporary, preliminary and permanent injunctive relief, without bond in any proper court which shall include the Circuit Courts of Cook County, Illinois. In addition to the above, should Employee breach this Agreement, Employer's rights shall be cumulative and Employer may also seek recovery of money damages as well. Thus, all covenants of this Agreement shall survive the termination of Employee's employment.

**12.　　Records Belong to Employer.**　All books, records, files, forms, reports, accounts, papers and documents relating in any manner to the Employer's business, vendors, suppliers, or customers, whether prepared by Employee or anyone else, are the exclusive property of the Employer and shall be returned immediately to the Employer upon termination of employment or upon the Employer's request at any time. This excludes items that belonged to the Employee prior to beginning his/her employment with Employer.

**13.　　Employee's Inability to Contract for Employer.**　Employee shall not have the right to make any contracts or commitments for or on behalf of Employer without first obtaining the express written consent of Employer.

**14.　　Vacation.**　The Employer provides vacation time for Regular Full-Time employees and expects employees to take time away from work to renew their energy and enjoy some leisure activities with family or friends. The amount of vacation time is reflected on Exhibit "A". You may not receive pay in lieu of vacation, except as required by law upon termination of your employment or as Employer shall agree. In order to insure that Employer is sufficiently staffed to continue orderly operations, vacation time must be pre-approved at least two weeks in advance. Employer may, in its sole discretion, not approve a request for vacation time due to scheduling problems or other business demands.

**15.　　Holidays.**　Employee shall be entitled to the following holidays with pay during each calendar year:

- New Year's Day
- Independence Day
- Thanksgiving Day
- Memorial Day
- Labor Day
- Christmas Day

**16.　　Compliance With Employer's Rules.**　Employee agrees to comply with all of the rules and regulations of Employer.

**17.　　Return of Property.**　Upon termination of employment, the Employee shall deliver all property (including keys, records, notes, data, memoranda, models, and equipment) that is in the Employee's possession or under the Employee's control which is Employer's property.

**18.　　Harassment.**　Employee acknowledges that Employer has a zero tolerance policy for any form of discrimination or sexual harassment or a hostile work environment. Any breach of this policy by Employee is grounds for immediate dismissal. All complaints of discrimination or sexual harassment should be made to Ryan Bracken or, if you prefer, to counsel for Employer, Anthony G. Barone at (630) 472-0037.

**19.　　Notices.**　All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or deposited in the United States mail, postage paid, addressed as follows:

3

GRAF04895

**Employer:**

Carlton Technologies, Inc.
2000 W. Fulton Street
Chicago, Illinois 60612

**Employee:**

Jeff Grafstein
729 Sumac Road
Highland Park, Illinois 60035

Such addresses may be changed from time to time by either party by providing them notice in the manner set forth above.

20.     **Entire Agreement.**     This Agreement contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written.  This Agreement supersedes any prior written or oral agreements between the parties.

21.     **Amendment.**   This Agreement may be modified or amended, if the amendment is made in writing and is signed by both parties.

22.     **Severability.**     If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable.  If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

23.     **Waiver of Contractual Right.**   The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

24.     **Applicable Law.**   This Agreement shall be governed by the laws of the State of Illinois.

**Employer:**

Carlton Technologies, Inc.

By: _____

Ryan Bracken, President

Date: _____

**Agreed to and accepted by:**

Employee:

Date: _____

4

GRAF04896

<u>Employment Offer and Agreement</u> – Exhibit "A"

Name:              Jeff Grafstein
Position:          Sr. Account Executive, Director of Wireless Data Collection and Scanning Devices
Date of Offer:     February 21st, 2002
Start Date:        February 25th, 2002
Office Hours:      8:00 AM to 5:00 PM, with one hour for lunch
Vacation:          Three weeks per year
Remuneration:

<u>Sr. Account Executive</u>:
Personal Commission payable monthly at 25% of gross margin (GM) produced. Recoverable draw for three months of $ 7500.00 per month.  Recoverable draw goes to $ 5000.00 per month after third month.

<u>Director of Wireless Data Collection and Scanning Devices</u>:
Commission override payable monthly at 5% of gross margin (GM) produced for company wide Wireless Data Collection and Scanning Devices. Override will not be paid on personal sales but will be paid on all other regardless of if product is new or refurbished.

<u>Note</u>:
Draw is paid on the Friday closest to the 15th and 30th/31st of the month (2002 pay schedule is attached). Draw is held back one pay period. Accordingly, first pay period will end February 28th with first draw payable March 15th, 2002. Commissions are paid one month after close of month, that is, February commission will  be paid at the end of March. Draw referred to above is for both employment functions.

<u>Benefits</u>:

1.   Full healthcare coverage paid for and provided (dental not included) in accordance with Carlton's Blue Cross / Blue Shield program for employee and family. Carlton may change healthcare providers at anytime. Due notice will be given to employee.

2.   Participation in company SEP program. Currently, Carlton contributes 10% of each employees annual wages (up to IRS allowable maximum) into a SEP program. Employee can invest money with any licensed financial institution. Monies are distributed on an annual basis generally in the spring of the following year. Carlton reserves the right to alter the percentage of contribution at anytime. In accordance with IRS regulations, all employees, directors, shareholders, etc. shall receive the same percentage.

3.   All business related travel expenses and reasonable entertainment expenses will be reimbursed /paid for by Carlton consistent with expense guidelines.

4.   Carlton will pay all communication costs for all business related issues including, telephone, fax, cell phone, etc.

**GRAF04897**

Job Description:

Sr. Account Executive:

Your primary function as a Sr. Account Executive is to generate revenue for Carlton in accordance with our current gross margin expectations. Sales goals will be set on an annual basis and are expected to be achieved. You will also be responsible for locating opportunities for Carlton to purchase equipment. Day to day management of accounts and customer satisfaction are also of utmost importance.

Account Executives are the front line representatives of our business and are expected to conduct themselves (either on the telephone or on customer visits, at trade shows, etc.) in a manner consistent with Carlton's positive and professional image within the retail marketplace.

As a small and growing company Carlton looks to its sales force for leadership within the organization as much as it does externally. Therefore, account executives are expected to maintain a positive attitude and leadership roll within the organization. Suggestions for improvement, new ideas, or even areas that appear to be problems are expected to be raised with management in the interest of improving the organization.

Director, Wireless Data Collection and Scanning Devices:

Your primary function as Director of this area will be to grow sales of all Wireless and Scanning Devices at Carlton Technologies. This area represents an enormous growth potential within the organization and we are committed to increasing customer awareness of the products we offer, and also want to move into markets that we currently do not participate in. Although sales people will still directly report to Ryan Bracken, you will be responsible for assisting all sales people with quoting all buys and sells in this area. You will also be responsible for all inventory decisions, i.e. - purchases, write downs, etc. In all cases you are expected to make decisions that balance the benefit of the organization, employees, and customers. You will be responsible for fostering relationships with all dealers within this community and for all sales in that area. You are also expected to stay current on market trends, opportunities, new products, and are also required to insure that the sales staff has proper product knowledge.

General:

In your capacity travel to customer sites, trade shows, sales meetings, etc. can be necessary. We will provide as much notice as possible in these instances and are aware and sensitive to personal commitments. We also ask that you be as flexible as possible when business travel becomes necessary.

A signed copy of Carlton's "Employment Agreement" (copy attached) must be signed prior to start date.

In exchange for the above, you agree to a minimum of one year of employment with Carlton. You further agree to act and work in the best interests of Carlton Technologies, Inc.


Understood and agreed to by _____     Date: __2/21/02__

Understood and agreed to by _____     Date: __2/21/02__
       Ryan Bracken
       Carlton Technologies, Inc.

# Exhibit Q

**From:** Jeff Grafstein [mailto:jeffg@biz120inc.com]
**Sent:** Friday, May 25, 2007 1:08 PM
**To:** 'Chris McCarty'
**Subject:** Thanks for your time (and business)

Hi Chris,

Thanks for your time on the phone yesterday.  As we discussed, my new company actively buys, sells and repairs a broad range of technology manufactured by:

### Symbol, Intermec, LXE, PSC, HHP and Zebra

We can help you through the:

- **Buy back** of hand held scanners, imagers and wireless data collection terminals
- **Repair** of scanners, terminals and fork truck mounted wireless devices
- **Sale** of replacement batteries for their RF terminals, label printers and two-way radios
- **Sale** of reconditioned scanners, RF terminals and accessories for your existing legacy systems

Please keep us in mind as you maintain/expand your current install base or migrate to newer technology platforms.

I can be reached at (847) 831-5149 or via email at jeffg@biz120inc.com

Thanks and have an enjoyable long weekend.

Regards,

**Jeff Grafstein**



| | |
|---|---|
| Direct dial: | 847 831 5149 |
| Toll Free: | 877 2 BIZ120 (877 224 9120) |
| Direct fax: | 847 831 5169 |
| Mobile: | 847 975 1276 |

**E-mail:      jeffg@biz120inc.com**

Quality ● Service ● Value ● Experience

CARLTON000009
HIGHLY
CONFIDENTIAL